ALBERT J. GILCHRIST v. ROBERT J. KELLEY ET AL.

[See 69 Mich. 400, 430; 83 Id. 653.]

*Partnership—Settlement—Fraud—Evidence.*

1. The bill in this case was filed to set aside a partnership settlement, in consummation of which the complainant transferred his interest in the firm business to the defendant, and for an accounting, because of the alleged fraudulent concealment by defendant of the value of his services in a matter in which the firm had been engaged involving the probating of a will and the settlement of controversies arising out of the claims made by the testator's heirs. And on a review of the testimony the decree of the court below dismissing the bill is affirmed.

2. Aside from the legal proposition that fraud will not be presumed, but must be established by satisfactory evidence, the almost uniform practice of this Court is, with a few exceptions, where there is a conflict in the testimony of witnesses, to give to the opinion of the presiding judge, who has had an opportunity to see the witnesses and judge of their veracity, great consideration in weighing their testimony.

Appeal from Bay. (Cobb, J.) Argued January 7, 1891. Decided May 8, 1891.

Bill to set aside a partnership settlement and for an accounting. Complainant appeals. Decree dismissing bill affirmed. The facts are stated in the opinion.

*A. J. Gilchrist* (*Hanchett, Stark & Hanchett* and *J. B. Tuttle,* of counsel), for complainant.

*Hatch & Cooley* and *A. McDonell,* for defendant Kelley.

CHAMPLIN, C. J. The bill in this case is filed by the complainant against the defendants to set aside a settlement of a partnership transaction between the complain-

ant and the defendant Kelley as copartners in the law business. Complainant charges that Kelley fraudulently concealed from him the value of his services in a matter in which the firm had been engaged in connection with the probating of a will and the settlement of controversies arising out of the claims made by the heirs at law of the deceased husband of Diana Richardson.

The bill was filed on the 23d day of April, 1888, and it alleged that a copartnership between the complainant and Kelley was entered into on the 1st day of September, 1885, for a period of one year, and that a few days after the 1st of September, 1886, a settlement was had between himself and his partner, in which he sold all his interest in the firm to Kelley for $960. It appears that he had drawn out from the firm something like $300 during the year. He charges that Kelley neglected to enter upon the books of the firm true and proper charges for the services which he rendered to and for Diana Richardson and others, but purposely concealed the value of those charges from him, and thereby defrauded him in the settlement.

After the answers were filed and the cause was brought to an issue in the circuit court for the county of Alpena, a stipulation was entered into transferring the suit to the circuit court for the county of Bay, and it was there heard upon proofs taken in open court as in a trial at law. Upon the hearing the complainant testified to the settlement had between him and Kelley as follows:

"Prior to the expiration of the copartnership I had intimated to Mr. Kelley my intention of leaving the law business, and so, on or about the 3d day of September, 1886, Mr. Kelley said, 'Gilchrist, have you fully made up your mind to leave the law?' I said, 'Yes.' He then said: 'I think you will make a mistake. Your prospects are good. I know of no one in Alpena with better prospects than yourself. Now, I intend to try for the circuit

judgeship at the coming election, and in any event, to retire from the active practice of the law, and to confine myself exclusively to the business of counsel; and if you will reconsider your decision, I will sell you my whole practice and my library, with a few exceptions, for the sum of three thousand dollars, and I will take your note in payment, and I will agree to give a bond not to practice for a certain time,'—I think it was three years. I said I didn't believe I wanted to buy it. He then said: 'It will take some time to close the business we have commenced, and I have carefully and fairly estimated its value,—estimated the value of the entire copartnership business to be worth about $2,500; and for the sake of a speedy settlement of our copartnership affairs I will buy out your interest on the basis of such estimate.' I thought the amount low, and I said so, and he said it was all that the business was worth. This was late in the afternoon. I think it was between five and six o'clock; and before accepting or rejecting his proposition at that time I went to the partnership books, to see what charge had been made in the Richardson business, if any, and I found that no charge whatever had been made of any kind of the business, and it seemed to me that there must have been other business relating to which the books bore no entries. From June to September there were no entries outside of the few that I had dictated myself, possibly with a few exceptions. And the next morning I said to Mr. Kelley that there were no charges made on the books in the Richardson matter, and he hastened to say that he had *memoranda* of all copartnership transactions not in the copartnership books, and that he had himself estimated from such *memoranda* and from the books. I said I had no means of determining for myself as to the adequacy of the estimate he had made, but if it was fair, and all the business was worth, if it included the Richardson business and all the business, I would accept the proposition; and he again said that it was fair and adequate, and that it included the Richardson business, and all the copartnership business, and he proposed to pay me with his notes with a responsible indorser; and on the 6th of September he came to me with a release or transfer prepared, and a notice for publication of the dissolution, and I signed it, and then he gave me three promissory notes for $320 each. These were made payable to the order of A. N.

Spratt. They were time notes, running four, eight, and twelve months, respectively, and were indorsed by Spratt in blank."

It appears from the testimony that on or about the 24th day of June, 1886, the firm of Kelley & Gilchrist was retained by Diana Richardson, and that the firm did certain business for her, which was not entirely closed up at the time of the dissolution. Mr. Gilchrist testified upon the hearing in the court below that he did a large amount of business pertaining to the Richardson matter, and that he estimated that at least half of his time from the 24th day of June to the 1st of September was employed in that business. He also testified that he made no charge whatever for those services upon the books of the firm; so it appears from his testimony that neither he nor Mr. Kelley had entered any charges upon the books for the services rendered in that matter up to the time of the dissolution. He further testified that some time prior to the 1st of September he had asked Mr. Kelley what charge they should make in the Richardson matter, and he said that he should wait, and make a lump charge when the business was finished. He was asked if he (Gilchrist) had formed any judgment about what the charge should be, and he replied:

"I had supposed that it ought to be a pretty good fee, but I had no idea as to what amount it would be."

It appears further from the testimony that some time in October Mr. Kelley presented a bill against Mrs. Richardson to her, in which he charged a lump sum of $20,-000 for the services he had performed for her up to that time. Gilchrist testifies that some time in November, 1886, he learned that Kelley had presented a charge against Mrs. Richardson for services, but it does not appear that he made any effort to ascertain the amount of such charge. He says that he did not know the

amount until he heard Mr. Kelley testify in his suit which he commenced against Mrs. Richardson to collect his charge, when Mr. Kelley testified upon the trial; and that, he thinks, was some time in June, 1887. He shows from his testimony that he was familiar with what services, by way of consultation and otherwise, were being performed for Mrs. Richardson by Mr. Kelley during the time the partnership existed; that they consisted mainly in frequent consultations between Kelley and Mrs. Richardson. He introduced testimony tending to show that at one time Mr. Kelley requested Mrs. Richardson not to inform Mr. Gilchrist about her affairs, as Gilchrist boarded with Mr. Frank Mason, who married a neice of Mr. Richardson, and whose father was an heir at law contesting Mrs. Richardson's rights to the property, as he (Gilchrist) might possibly speak of it. Mr. Kelley denies that he ever made such a request to Mrs. Richardson, but, on the contrary, states that she requested him not to inform Mr. Gilchrist, and that he told her that it would be impossible not to do so, as he was a partner of his in business.

Mr. Kelley also testified upon the hearing in the court below with reference to his settlement with Mr. Gilchrist as follows:

"As it approached the 1st day of September, which would be the termination of our partnership, I said to Mr. Gilchrist: 'You and the clerk should go to work and have everything on the books, and gather together everything pertaining to the partnership business. * * * You know it will soon be the 1st of September.' * * * He says to me at that time, 'Can't we continue the partnership another year?' I said, 'No, sir;' and he said, 'Have things been satisfactory?' and I said: 'Mr. Gilchrist, I have no fault to find with you, but you have been of no particular service to me, and I cannot afford to divide my earnings with you, and we will settle up on

the 1st of September. You get everything on the books,
and we will settle according to the books.' And he said
nothing further at that time, but for one or two or
several days he and the book-keeper at times would be
working on those account-books in their room, and there
is where they remained. They were rarely, if ever,
brought into my room, but in the going backward and
forward directing the clerk to do things I would see they
were working on the books. I think what appears on the
books after the 1st of June was written in the last three
or four days in August. About the 1st day of Septem-
ber (think it was the 1st) he came to the office, and
says to me, 'I have got everything on the books, I think,
except what belongs to the Richardson matter;' and he
says, 'What do you think we ought to do about that?'
I said: 'Mr. Gilchrist, it is a hard thing to say. The
work is not completed, and the matter may largely
depend upon the result.' He says, 'What will you give
me in a gross sum, and not close up the partnership
business?'

"Q. What do you mean by that,—'not close up the
partnership business?'

"A. Not to wait until it was all closed up, and the
money received in the different matters.

"I said, 'Mr. Gilchrist, I am not in a position to buy;
I would prefer to sell;' and he said at that time he
would like to remain in the business,—at the time I first
informed him it must be closed. I said, 'You have
plenty of money;' and he said, 'What will you take for
your business and library.?' I said, 'There are parts of
that library I would not sell for money, but the main
part of it I will sell. I will sell you all the state reports
and the United States reports, but there are certain
text-books that I have picked up that I would not
sell. Those books I would not sell. I would not
sell you those, but the rest of the library I will
sell you.' And he said, 'What do you want for the
business?' I was sitting right at my desk, and I had
just made up my mind about what amount of books I
would sell him and what they were worth,—the state
reports and a line of text-books. My own business was
entirely distinct from the Kelley & Gilchrist business,
that I had been engaged in before the partnership
existed, and it represented business up to that date. I
said, 'I will take $4,500.' 'Well, he says, 'it would not

be much use to me to buy you out and you go into business.' And I said, 'I will give you a contract not to go into business in this county except when I am retained by a practicing attorney. I will not keep an office open, and will not engage in practice here, unless retained by a practicing attorney here.' And he said, 'What would you be willing to give me for my interest here?' I had not seen the books at that time, and he knew more about them than I did; that was part of his business to attend to them; and I think I asked him how much we had done that year, and he said, 'The cash account shows about $1,700 that we have received;' and he says, 'There is a large amount of business that has been commenced, and the work not done.' I says, 'Don't you think it would be a fair thing to call the year's business $4,000?' and he says, 'I should think it would.' I took $4,000 and the amount he gave me for cash services and deducted it,—the cash account, as it appears now, is seventeen hundred and odd dollars. I deducted the amount he gave me from $4,000, and I made the estimates on that estimate. I concluded to give him $960, and made him that offer there. I cannot remember the figures, but whatever they were the three-eighths and five-eighths would be—$960 would be three-eighths of the amount. That is the way I arrived at it. I remember it distinctly, as though it was this minute, of making figures right there before me, and deducting the amount that he gave me as the cash account; and before I had written them there he said, 'How long will you give me to think of it?' And I said, 'How long do you want?' This was on the 1st day of September, and I am certain of it. And he said, 'I would like two or three days;' and I said, 'Take any reasonable time you desire.' And I said to him then if he could get a good partner there would be no trouble for him to hold the business, and I said to him, 'You understand that Mrs. Richardson will not do business with you. I am obligated to see her through to the end. I have promised to stand by her through the fight, and I reserve that from the bond or contract to go out of business.' And in the same connection with that I spoke of the fact that we had received a retainer from the Mason Lumber Company and from the Miner Lumber Company, and as those ran until the 1st of January, until that time I should be under obligation to give them such counsel as they

required of me, because we had received a retainer, and
they would have the right to ask me any questions of
their business they might come to the office and ask,—a
general retainer. We would charge them whatever was
right for work outside of that, and I told him I should
continue until the 1st day of January for them.

"After that he went to his room and adjusted his desk
by putting the papers in the drawers, fastening the desk,
and put some papers in he had, and went out. The next
day I do not think he came to the office at all. Once or
twice he came in and went and got something out of his
desk, and it went along until the 6th of September, and
then he came in and said, 'I will accept the amount you
offered me for my interest.' I said: 'Mr. Gilchrist, you
had better buy me out. You are a young man, and you
say you want to continue the business. I am making you
a good offer. You have got money and rich relatives, and
there is nothing in the way of your success if you get a
good partner.' He says: 'I do not think I could keep
the clients if I should buy your business. I do not think
I could keep the old clients.' 'Well,' I says, 'Mr. Gil-
christ, I do not feel as if I could go and ask my friend
to indorse or to help me raise $960. I will make you
this offer: We will settle everything, and we will divide
the business. You take a case and I will take a case,
and if you intend to go into practice you will have some-
thing to start with, and will have business right from the
start.' He said, 'I do not want to wait until it is closed
up and have to take my chances.' 'Very well,' I said,
'you come in in an hour. Mr. Spratt is in the city, and
I will try and have the notes indorsed.' I had agreed to
get Spratt, because he wanted responsible men that the
bank would take, and if he bought me out he was to
give me his brother's, and was to have the same time,—
4, 8, and 12 months. There was not any money to be
paid, and he asked me if his brother would be satisfactory,
and I told him, 'Yes, for any amount.' And I telephoned
to Mr. Spratt at his house, and asked him to come to
my office, and he came down. I told him what I wanted,
and he indorsed those three notes; and just about the
time he got away, and perhaps he hadn't got out of the
office, when Mr. Gilchrist came in, and I told Mr. Gil-
christ, 'I have got the indorsements here.' And I called
the clerk in there and directed him to take my seat and
write the agreement,—the agreement of dissolution. I

dictated that paper to the clerk sitting at my table in my room at the office. Mr. Gilchrist sat right by and heard me dictate it. I also dictated that one, and I signed it, and Mr. Gilchrist signed it, and I gave him three notes, and closed the transaction; and he ·went into his room and gathered some things, adjusted his desk, and went away; and the next day he took his desk out of the office. The papers were signed on the 6th day of September, 1886, the date of those notes. I want to state here another thing that took place right at the time or before these papers were signed, and before I gave him these notes. I said to Mr. Gilchrist: 'I am satisfied if you would wait until this business could be closed up, and do the best you can towards helping in closing it up and getting the money out of it, that you would realize more than I offer you; but I cannot afford to advance the money and take the chances, and pay you the last cent there is in it.' I urged him to wait until the business was closed up, and help me close it up, and take his chances; and he said he preferred to take that sum now than to wait until the matter was closed up."

He further testified that he made the offer of $960—

"Upon the basis of a fair and reasonable average of the business we had done. I made that upon the basis of the business that I had done in former years, other years. I had done from three to four thousand and forty-five hundred a year, good and bad. That had been about the extent of my business, and I took that as about the average of what we had done that year. It may have been a little less or a little more than I had done the year before. I think the business that year ·was less. There was a falling off from 1885 to 1886 in the law business in Alpena county. There was a very perceptible falling off that year from what it had been in former years."

With reference to the knowledge which Mr. Gilchrist had of the work which he had rendered the Richardson estate during the time preceding the 1st of September, he testified:

" He knew substantially everything that had ˋbeen done. He knew everything pertaining to the business transac-

tions. He did not know of the little peculiar characteristics of my client that took place at her house. I did not tell him that, and I did not consider it my duty to tell him that; but he had a general knowledge of what had transpired. He was present whenever Mr. Turnbull or Mr. Sleator came down there. When I sent for them to come and consult with me in regard to any matter, Mr. Gilchrist was present and heard the discussion. He was present at every piece of work that was done with the clerk, and that the clerk worked on, and he knew what I was doing. He heard the telephone ring, and knew who it was called me, and asked if it was Mrs. Richardson, because she called very frequently. He always knew where I went, and when I came back. He asked me to keep him advised as to this property, and what they would probably do with it, because he and his brother anticipated that they might become purchasers when it was in a condition where it could be sold."

The circuit judge, before whom the hearing was had and the witnesses examined, entered a decree dismissing the complainant's bill.

As to the fraud charged in the bill of complaint, the complainant's case is supported exclusively by his own testimony. Those charges are met and denied by the testimony of defendant Kelley. They all arise and are founded upon what was said and done at the time the parties talked over and settled up their partnership business. The vital question hinges upon the credit which this Court should give to the testimony of these two witnesses.

Aside from the legal proposition that fraud will not be presumed, but must be established by satisfactory evidence, the almost uniform practice of this Court is, with a few exceptions, where there is a conflict in the testimony of witnesses, to give to the opinion of the presiding judge in the court below, who has had an opportunity to see the witnesses and judge of their veracity, great consideration in weighing the testimony

of such witnesses. It seems to me that before we can arrive at a different conclusion from that of the court below we must disregard entirely the testimony of Judge Kelley, a man who has resided in Alpena for more than 20 years, who is well known in the community where he lives, and has the respect and confidence of the electors in the twenty-sixth judicial circuit, who have elected him to fill the high and responsible position of circuit judge, an office which he now holds. Speaking for myself, and in view of all the testimony, I must say that I rely upon the truth of the statements of Judge Kelley in his version of what was said and done at the time of the settlement between himself and complainant. When it is considered that every fact as to the nature or extent of the business which had been done at that time for Mrs. Richardson was well known to the complainant; that nothing respecting it was concealed from him, and no misrepresentation made to him concerning it; that at the time of the settlement Judge Kelley offered to sell his interest in the partnership, including all he had done for Mrs. Richardson, and including his law library, with few exceptions, for $4,500, and not to keep his office open, nor practice law in the county unless retained by a practicing attorney there,—the idea of fraud perpetrated upon Gilchrist is entirely dispelled.

In order to weigh the testimony fairly we ought to view the situation as it appeared to the parties at the time. So far as the Richardson case is concerned, its phase was entirely new, for no litigation in that section of the State had ever occurred involving such large interests. The attorneys engaged had no conception of what the charges under such circumstances ought to be. They viewed it in the light of their services for ordinary litigation, and, whatever the possibilities for large or extraordinary charges, they were offered to Gilchrist by

Kelley, with a portion of his library, for $4,500. Gilchrist declined to buy, but proposed to sell; and he sold to Judge Kelley upon nearly the same basis. Soon thereafter Kelley talked with Detroit lawyers, and made up his mind that he ought to be paid a large amount for his services, and made out and rendered to Mrs. Richardson a bill for $35,000. Mrs. Richardson did not regard his services of so much value, and he brought suit. No amount had been agreed upon between Mrs. Richardson and Judge Kelley as to what he should charge for his services, and no charge had been made at the time of the settlement,—he having stated to Mr. Gilchrist that when the services were completed he should charge a lump sum. The charges he made were in fact largely speculative, and must in the end depend upon what a jury should find the services performed were reasonably worth. Upon the trial Gilchrist was sworn as a witness for Mrs. Richardson, and, with a view of showing that the services were not worth what Kelley charged, Gilchrist testified the amount for which he sold his three-eighths interest in the partnership, which included the greater part of the charges against Mrs. Richardson. Gilchrist knew at the time he testified, if he did not before, what Judge Kelley claimed his services were worth, and he made no claim that he had been defrauded, or that the value of such services had been misrepresented to him. If he ever was defrauded, it was at the time of the settlement, and the fact whether he was defrauded at that time depended upon the success of Judge Kelley and his winning the suit with Mrs. Richardson.

The law requires one who has been defrauded to act promptly upon the discovery of the fraud. Gilchrist did not act promptly in seeking redress, but lay quietly by, waiting the outcome of Kelley's suit with Mrs. Richardson. He did not say: "It has been misrepresented to me, but

as a partner I offer to furnish my share of the expense of prosecuting it to a successful issue, and give my services if need be." On the contrary, he waited until with great expense Kelley recovered judgment in the court below, and not then did he make a claim. He waited until after two arguments in the Supreme Court, after all the expense had been incurred, after all the risk of loss had terminated, before he put forth any claim. He was awaiting the result, and if Kelley was successful in the suit then he had been defrauded, and the facts had been misrepresented by Kelley in the settlement; but, if Kelley lost the suit, and after all the costs and expenses of the prosecution had been incurred, and all the costs he would be adjudged to pay, then he had not been defrauded, and Kelley had taken no advantage of him. This expresses the true situation. Had a majority of the Supreme Court concurred in the opinion filed by the minority of that Court, it is very probable that we should never have heard of the suit of *Gilchrist. v. Kelley.* His position is one that does not commend itself to a court of equity. It is a speculation upon the uncertainties of a law suit, where he had nothing to lose in any event, and a chance to gain by setting up a stale claim of fraud if the suit terminated to Kelley's advantage.

It is not my purpose to review all the testimony or state all the facts in detail. The record abounds with testimony with reference to other suits and other proceedings which are entirely immaterial to the issue in this case.

I think the decree of the circuit court was right, and should be affirmed, with costs.

LONG and McGRATH, JJ., concurred with CHAMPLIN, C. J.

GRANT, J. *(dissenting).* September 1, 1885, complainant and defendant Kelley entered into a copartnership

for the practice of the law, to continue for one year. By the agreement, which was in writing, Kelley was to receive five-eighths and Gilchrist three-eighths of the proceeds of the business. Kelley was a practitioner of long standing and experience, having lived in Alpena, Mich., for some 20 years. Gilchrist was a young man, admitted to practice in the state of Ohio only three months prior to the formation of this copartnership. At the close of the year they decided not to continue in business together, and after some negotiations Kelley bought out Gilchrist for the sum of $960 as his share in the interest of the business. This was upon the basis that $2,500 was the fair value of the year's business, exclusive of the cash receipts. This settlement was concluded September 6, 1886, notice of dissolution given, and Gilchrist assigned all his interest in the assets of the firm to Kelley. Gilchrist subsequently claimed that he was deceived and defrauded in this settlement, and brought this suit to set it aside, and to obtain an accounting from Kelley. The controversy arises over two items,—one a fee of $20,000, for which defendant recovered a judgment against Diana Richardson; the other a note of $5,000, which Gilchrist insists was received for services rendered by Kelley & Gilchrist, but which Kelley insists was a gift to him on account of services for which he had made no charge. A full statement of the facts is necessary to a full understanding of the questions involved.

June 18, 1886, one Charles W. Richardson died, leaving an estate valued at several hundred thousand dollars. He left a widow and several brothers and sisters, but no children. A will, executed many years before his death, was presented for probate. By this will his large estate was devised to his widow, Diana Richardson. The collateral heirs raised the question of a subsequent will. Moore & Moore, attorneys from Detroit, were employed

by the heirs.  The matter was amicably settled on August 30, 1886, by Mrs. Richardson paying to George Richardson, one of the heirs, for the benefit of all, $120,000. The firm of Kelley & Gilchrist was employed by her June 24, 1886, to look after the estate. This employment was made with Mr. Kelley.  Mrs. Richardson did no business directly with Mr. Gilchrist.  She went to the office of Kelley & Gilchrist but twice, and then did not see Mr. Gilchrist.  The testimony is conflicting as to how this happened; the testimony of the complainant tending to show that Kelley requested Mrs. Richardson to keep Mr. Gilchrist ignorant in the matter, and the testimony on the part of Kelley tending to show that she requested him to keep Gilchrist ignorant because he was boarding with one of the heirs.  It is immaterial to determine which is correct.  The important fact remains that Gilchrist was not consulted by her, and that all he knew of the matter was derived from his partner, Kelley. Kelley, however, informed Gilchrist of the questions involved, who assisted in looking them up.  Gilchrist also appeared in the probate court, and assisted in proving the will, which occupied only about half a day. Aside from these, Gilchrist took no part in the settlement of the estate.  No other serious contest arose in the settlement of the Richardson estate.

After the dissolution of the firm Kelley continued to act as Mrs. Richardson's adviser until some time in October, or, as he said, in November, following, and on October 21, 1886, he rendered to Mrs. Richardson a bill for "professional services from June 24 to October 21, 1886, in probating and closing the estate under will of deceased, and other services connected with the said estate, $20,000."  This Mrs. Richardson declined to pay, and Kelley thereafter brought suit against her, in which

he filed a bill of particulars, claiming $35,000.  This bill of particulars is as follows:

June 24—

| | | |
|---|---:|---:|
| To retainer in the matter of will of Charles W. Richardson, deceased | $10,000 | 00 |
| To making brief and preparing for contest | 10,000 | 00 |
| To probating will and closing up estate | 10,000 | 00 |
| To services in counseling and assisting in management of business from July 26 to November 22, 1886 | 5,000 | 00 |
| | $35,000 | 00 |

June 11, 1887, Kelley recovered a verdict and judgment against Mrs. Richardson for $20,000.

When the question of the subsequent will arose, Kelley, by the direction of Mrs. Richardson, associated with him in the matter two attorneys, residents of Alpena,—Messrs. Turnbull and Sleator.  After that matter was settled, each of these attorneys presented a bill for services, which Mrs. Richardson declined to pay, and they each brought suit against her, each recovering a verdict for $8,000.  These three suits against Mrs. Richardson were appealed to this Court, and the judgments affirmed April 20, 1888.  69 Mich. 400, 430, 478.

It was the custom, as well as duty, of both Gilchrist and Kelley to make charges for the business done by each individually, and to enter the same upon the partnership books.  No entry was made upon the books by either of any charges for services rendered the Richardson estate or Mrs. Richardson.  Kelley testifies that from the time of his employment to its close in October he was in consultation with Mrs. Richardson at her house on an average from three to four times a day.  The above are the undisputed facts, and in the light of them we come to the settlement between Gilchrist and Kelley.

It is apparent that Gilchrist, both from his inexperi-

ence and his lack of the full knowledge of the services rendered by Mr. Kelley, was not as well qualified to judge of the value of the services as was Mr. Kelley. In this respect they clearly were not on an equal footing. It was the duty of Mr. Kelley to put his partner in possession of all the facts within his knowledge, and to give him his judgment and decision upon the value of the services rendered. The duty belonged to him as the more experienced lawyer, and as being more familiar with the facts and the value of his services. If he failed in the performance of this duty his conduct was a fraud upon Mr. Gilchrist, and it becomes of no consequence whether Mr. Kelley was guilty or not of an actual intent to defraud. Briefly stated, Mr. Gilchrist's testimony is that Mr. Kelley told him that he had carefully and fairly estimated the value of the entire copartnership business to be worth about $2,500; that for the sake of a speedy settlement of the copartnership affairs he would buy out Gilchrist's interest on the basis of that estimate; that Gilchrist told him that he thought the amount low, to which Kelley replied that it was all the business was worth; that after examining the books, and finding no entries in regard to the Richardson business, he told Mr. Kelley that there were no charges made upon the books in regard to that matter; that Mr. Kelley said he had *memoranda* of all copartnership transactions not entered therein, and that he made his estimate from such *memoranda* and the books; that Gilchrist said he had no means of determining for himself the adequacy of the estimate, but if it was fair, and all the business was worth, and included the Richardson business, he would accept the proposition; that Kelley again assured him that it was fair and adequate, and included the Richardson business, and all the copartnership business; and that he, Gilchrist, relied upon these representations, and made

the settlement, which he would not otherwise have done.

Gilchrist would not certainly have made this settlement had he had any intimation that Kelley valued his services at such a figure. The settlement was therefore made by Gilchrist without any knowledge or information of the real value of those services, which constituted the great bulk of the partnership assets. It is a fair presumption that Gilchrist would not have settled for that sum without some assurance from Kelley as to the value of these services. Kelley at that time either did or did not possess a knowledge of the value of those services. He either did or did not inform Mr. Gilchrist what his knowledge and judgment thereof were. If he possessed such knowledge, and failed to communicate it to Gilchrist, he committed an intentional fraud. If in fact he then possessed no such knowledge, and had formed no judgment, it follows that he accomplished the settlement with Gilchrist upon a false basis, excluding an important element then unknown to either. The result in the latter case is as unjust and as disastrous to Gilchrist as in the former. If the latter be the case, upon what principles of equity or morality can Kelley be allowed to profit by a settlement made by both in ignorance of an important fact? Shall Kelley be allowed to profit by his own ignorance, when it was his duty to be first informed, and then to inform his less experienced partner, who did not possess his facilities for information? May Kelley, under such circumstances, pocket $7,500 which in justice belongs to Gilchrist? To deny relief under these circumstances would, in our judgment, be a disgrace to a court of equity.

This brings us to Mr. Kelley's version of the transaction. He says that about a week before the 1st of September he informed Mr. Gilchrist that their partnership could not continue another year; that he instructed

Mr. Gilchrist to get everything on the books, and that they would settle according to them; that about the 1st of September Gilchrist told him that he had got everything on the books except what belonged to the Richardson matter; that he said to Gilchrist it was a hard thing to say what ought to be done about that, the work was not completed, and the matter might largely depend upon the result; that Gilchrist then asked him what he would give in a gross sum for his interest; that he replied he preferred to sell, and offered to take $4,500, with certain reservations; that the cash account showed receipts of about $1,700; that he asked Gilchrist if he did not think it would be a fair thing to call the year's business $4,000; that Gilchrist said he thought it would; that he then deducted the $1,700 from the $4,000, and made the estimates on that estimate, and offered Gilchrist $960; that he said to Gilchrist that Mrs. Richardson would not do business with him; that he, Kelley, was obligated to see her through to the end, had promised to stand by her through the fight, and therefore reserved that from his contract to go out of business should Gilchrist buy him out; that Gilchrist asked for two or three days to consider, which he gave; that on September 6 Gilchrist accepted his offer to buy him out; that in this settlement the value of the services in the Richardson matter was not determined; that it was utterly impossible, under the situation of things, to determine it; and that the offer was made in gross, without going into details. Being asked upon what basis he made the offer to Gilchrist, he says:

"Upon the basis of a fair and reasonable average of what we had done. I made that upon the basis of the business that I had done in former years,—other years. I had done from three to four thousand and four thousand five hundred a year, good and bad. That had been about the extent of my business, and I took that as about the

average of what we had done that year. It may have been a little less or a little more than I had done the year before. I think the business that year was a little less. There was a falling off from 1885 to 1886 in the law business of Alpena county. There was a very perceptible falling off that year from what it had been in former years."

He further testified that Gilchrist knew substantially everything pertaining to the Richardson business; that he had a general knowledge of what had transpired, but that he (Kelley) "did not inform him of the little peculiar characteristics of his client which took place at her house;" that he (Gilchrist) understood distinctly it would be almost impossible to say what would be a reasonable charge; that he (Kelley) had not made up his mind what his charge would be, until about the time he rendered his bill, saying: "I didn't know what would be the usual and ordinary charge. I only wanted what other lawyers would charge under ordinary circumstances."

Such is substantially the story told by Mr. Kelley. It exhibits some remarkable features and serious defects. The statement that it was impossible at the time of the settlement with Gilchrist to estimate the value of the services in the Richardson matter is entirely without foundation. It was no more difficult then than when he rendered his bill October 21, on which day he was still in the employ of Mrs. Richardson, and says he so continued until about November 22. The only contest was over the will. This was settled during the copartnership, and was the chief element in the large bill for services rendered. $20,000 in the bill of particulars is charged for that alone. His testimony in the suit against Mrs. Richardson shows that this contest was the chief element in making his charges. Upon that trial he testified:

"It was the most important case I had ever had in all my practice. It was a case that of necessity was to be

one of State reputation. It was a case in which I considered that, to be successful in, where a contest was made by those twelve heirs, was a matter of some importance to me, and was a matter of great importance to my client, so that my client required that I devote my time, regardless of anything and everything else of my own business. She went so far as to ask me whether or not I could not give up all my other business, to assist her until this estate was closed up and converted into money.

"*Q*. What did you charge her $25,000 for? Five months' services?

"*A*. Well, sir; because I think the services rendered in a matter of this magnitude and importance of so large an interest to the party, that the services that were actually rendered, and the result of securing the entire property to her, I think it is fairly well worth it, and I base that judgment upon what I know of the elements that are taken into consideration in estimating such services under similar circumstances, and what the best practitioners in the State would assume would be fair and reasonable.    *    *    *    I have not charged Mrs. Richardson any more in this case than I would charge any client in an ordinary litigation, taking into consideration the importance of the case and the amount involved.    *    *    *    *    *    *    *    *    *    *    *

"*Q*. Would you not have accepted five thousand dollars a year from her for a year's services if she would have employed you?

"*A*. If she would have employed me for five years, I would. I would not have taken it for one year. I would not have accepted a five thousand dollar retainer if she had offered me a retainer that was to cover my services or my retention."

Under this testimony it is impossible to believe that Mr. Kelley did not conceal from his partner his real judgment as to the value of the services.

But this is not all. In the suits brought by Mr. Turnbull and Mr. Sleator against Mrs. Richardson for services rendered in the same contest, Mr. Kelley was a witness for the plaintiffs, and in his testimony showed

great familiarity with and knowledge of charges for legal services in this State. He valued Turnbull's services at from $12,000 to $15,000, and Mr. Sleator's at $10,000. His testimony in those cases as an expert was only admissible upon the basis of his familiarity and knowledge of the value of such services, gained by experience. If all he knew of such charges were statements made to him by other members of the profession within six weeks prior to his rendering his bill, his testimony would have been excluded. Such testimony would have been as incompetent as that of a layman who had made inquiries and received similar statements.

The situation is therefore forced upon us that Mr. Kelley, a man of age and experience in the law, in his dealing with a man of youth and inexperience keeps from him, either intentionally or unintentionally, that which it was his duty to disclose, and that therefore the settlement made was void. It is also significant in this connection to notice that Kelley, in his suit against Mrs. Richardson, testified that he "offered Gilchrist so much money to go his way on the 1st of September; that the proposition reserved entirely the Richardson business; and that he knew nothing about it, and had nothing to do with it." This position is entirely inconsistent with the one taken in the present case, and shows the unreliableness of Mr. Kelley's testimony. His testimony is untrue, either in the one case or in the other. Under this record, no light, in our judgment, is thrown upon the transaction, nor is Mr. Kelley's credibility as a witness enhanced, by the fact that he was, shortly after his settlement with Gilchrist, elected to the office of circuit judge.

Kelley complains that Gilchrist acted inequitably towards him upon the trial of his suit against Mrs.

Richardson, in that he testified against him, and cast his influence and sympathy with Mrs. Richardson. The claim is not sustained by the evidence. Kelley at no time applied to Gilchrist for his assistance, nor did he ask for his testimony. After the partnership between him and Gilchrist had been proven upon the cross-examination of Kelley, Gilchrist was subpœnaed on behalf of Mrs. Richardson, and gave only such testimony as was elicited by a proper examination. He volunteered no testimony or information to the defense in that case. He testified simply of the settlement made with Kelley, and that the services rendered the Richardson estate were included in that settlement, which testimony, as above shown, was denied by Mr. Kelley, who claimed that the Richardson matter was not included. Gilchrist did no more than he was compelled to do under the subpœna, and he testifies that he gave this testimony under protest.

It is also claimed by Kelley that Gilchrist was guilty of laches in not moving promptly after ascertaining what he believed to be his rights, and also in not returning the notes which he had received in settlement. There is no foundation for this claim. Gilchrist had disposed of these notes prior to the trial of the suit of Kelley against Mrs. Richardson. He disposed of the last one in April or May, prior to the trial, which was June 11. If, however, he had still retained the notes, he would have been under no obligations to return them, nor was he under any obligations to return their value in any aspect of the case. Kelley owed him more than that. Kelley was not, therefore, injured nor prejudiced in his rights by the retention of the notes or money. A party might be insolvent, and in such case there would exist the best of reasons why the money or property received in settlement should not be returned. The rule requiring a tender or return of the property received upon a contract void for

fraud does not apply to such a case. What Gilchrist received he was entitled to. He was also entitled to more. So long as Kelley was not injured by any delay on the part of Gilchrist, Gilchrist's right to maintain this suit remains until barred by the statute of limitations.

Soon after Kelley rendered his bill to Mrs. Richardson, Gilchrist heard of the amount, but there was nothing to inform him what proportion of that bill Kelley claimed was earned by the firm of Kelley & Gilchrist. It was not until he heard Kelley's testimony upon the trial that he became informed of the situation. He then immediately consulted Mr. Turnbull as to his rights, and informed Mr. Turnbull that he desired to bring suit to set aside the settlement. Turnbull advised him to wait until the final determination of Kelley's suit; Gilchrist at the same time saying that he did not desire to have his rights prejudiced by delay. Within three days after the decision of the case in the Supreme Court Gilchrist filed the bill in this case. It is no reply to Gilchrist's right of action to say that he waited with the intention to bring suit if Kelley won and to remain silent if Kelley lost. If Kelley lost, there was nothing to fight over. If Kelley was honest in his statement to Gilchrist at the time of the settlement, that he did not know what the services were worth, and allowed Gilchrist to settle upon that basis, good conscience would have directed him to inform Mr. Gilchrist, and give him an opportunity to assist him in maintaining the rights of both. It was Kelley's duty to move to Gilchrist; not Gilchrist to move to him. Kelley failed to move, and therefore cannot now be heard to complain of Gilchrist's temporary silence. What right of complaint has Kelley, who was acting all the time in hostility to and denial of the rights of Gilchrist? We think Gilchrist moved with all the promptness that the circumstances required. This Court can

now do exact justice between them, by requiring Gilchrist to pay his portion of the expenses of that litigation.

The judgment rendered in the case of *Kelley v. Richardson* was assigned by Kelley to defendant Spratt with a full knowledge of the claims of the complainant therein, and he must therefore be held liable for the moneys received thereon.

After the settlement between Mrs. Diana Richardson and George Richardson on behalf of himself and the other heirs, Kelley assisted Mr. Moore, one of the attorneys for the heirs, in effecting a settlement between George Richardson and the other heirs. This settlement was effected by the payment to each of them of $1,500. Some of these heirs brought suit to set aside that settlement on the ground that it was obtained by fraud, each of them claiming that he was entitled to $7,500, instead of $1,500. That case was heard and appealed to this Court, and decided at the last October term. *Richardson v. Richardson*, 83 Mich. 653. It was remanded to the court below for the want of proper parties, with directions to the court to permit the bill to be amended, so as to make all those parties who had received any of the funds. Diana Richardson in her settlement with George turned over, among other things, to him a note of $5,000, as a part of the $120,000. This note George Richardson transferred to Kelley, and is the other item of dispute in this case. Kelley insists that this was a present to him on the part of George Richardson, while Gilchrist insists that it was for services rendered by Kelley in effecting that settlement while a member of the firm. The only testimony in regard to this note comes from defendant Kelley. He says that on October 4 George Richardson sent for him to come to his house; that he went, and Mr. Richardson told him that these parties were threatening trouble to

him and his folks if he should be called away, and asked him to promise to defend them; that he told Mr. Richardson he would, and left him. A few days after that Kelley says he received an envelope containing this note, without any letter, and the only way he could know it came from George Richardson was that it was payable to him and indorsed by him; that the next morning he went to Mr. Richardson and asked him what it was for, and Richardson replied: "What did you promise me yesterday?—to look after my wife and children if I am called away." Kelley replied that that was more than he should want, and Mr. Richardson said: "You know what you have done for me. There was litigation you took charge of when I could not pay." While it is undoubtedly true, as seems to be conceded by Kelley's counsel in their brief, that this note was partly in compensation for services rendered by Kelley in that settlement, yet we do not think, under the testimony, that it can be considered a partnership asset. Besides, if Mr. Kelley should be made a party defendant to the suit brought by the heirs to set aside the settlement, he may be compelled to surrender the proceeds of that note as a part of the fund belonging to the heirs.

The decree of the court should be reversed, and decree entered here declaring the settlement void, and remanding the case to the court below, with instructions to refer to a commissioner for an accounting between the parties.

MORSE, J., concurred with GRANT, J.